IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.                                              17-CR-15-A

TYRONE PENNICK
                Defendant.

---

**GOVERNMENT'S POST SENTENCING HEARING MEMORANDUM OF LAW**

### I.        PRELIMINARY STATEMENT

On October 17, 2018, the defendant was found guilty by a jury of all counts in the Indictment 170CR-15-A. On September 28, 2020 and September 29, 2020 a sentencing hearing was conducted before this Court. At the hearing, the government called several witnesses to testify as to the defendant's continuous and historical drug dealing, and the relation it had to his convicted conduct. In addition, the government called a witness who testified as to the defendant's solicitation to murder his co-defendant on Indictment 17-CR-15-A.

A. Trial Facts under Indictment 17-CR-15-A

The proof at trial showed that, on June 26, 2014, the defendant was released on pretrial release for a pending case under Indictment No. 10-CR-191-A. (Docket Entry 144, p. 5,Trial Transcript of  USPO Peter Lepiane, marked as Government's sentencing hearing Exhibit 17

and 10-CR-191 Docket Entry 791).[1]  As part of this release, the defendant was ordered to abide by all terms and conditions set by the Court, and the United States Probation Department.  One of these conditions was that the defendant reside at 489 Emerson Dr., Amherst, New York.  The defendant was supervised by United States Probation Officer (USPO) Peter Lepiane from June 26, 2017, until November 17, 2016.

According to trial witness, Donnell Cherry, during the time of his release (around the summer of 2016), the defendant sold him multiple ounces of cocaine. (See Docket Entry 125, p. 23, Trial Transcript of Donnell Cherry).[2] Eventually, on November 9, 2016, Cherry's house was raided by the Erie County Sheriff's Department (EDSD), where 4 ½ ounces (known on the street as a "Big 8"), where found. (See Docket Entry 125, pp. 5-6, Trial Transcript of Donnell Cherry). According to Cherry, these 4 ½ ounces were the remainder of the 3 "Bigs" (total of 18 ounces) that the defendant provided a week prior to the search. (See Trial Transcript of Donnell Cherry, pp. 5-7).[3]  Although limited by an evidentiary ruling at trial, (Docket Entry 125, pp. 9-22), Cherry testified before the grand jury that, when he was approximately 17 or 18 years old (from 1998-2000), the defendant gave him cocaine to sell. (See Government's Hearing Exhibit 16, pp. 5-9, Grand Jury Testimony of Donnell Cherry).[4]

---

[1] USPO Lepiane supervised the defendant until November 17, 2016, when the defendant was arrested on the 17-CR-15-A case. (See Government's Exhibit 17, p. 20). Prior to this release, the defendant remained in custody, on Indictment 10-CR-191-A since the time of his initial arrest in October of 2008.

[2] Cherry did not know the exact date that he started dealing with the defendant, at this time, but testified that it was "about three, four months before" the time his house was raided by the Erie County Sherriff's, which occurred in November of 2016. (See trial transcript of Donnell Cherry, pp. 4, 23-24).

[3] Cherry owed the defendant $16,000 for the 3 "Bigs" (18 ounces) of cocaine. (Trial Transcript of Donnell Cherry, p. 7).

[4] Cherry testified before the grand jury that he was born in 1982. (See Government's Hearing Exhibit 16, p. 2).

At that time, the defendant would give Cherry approximately a ½ ounce of cocaine to sell. (See Government's Hearing Exhibit 16, p. 8). This drug relationship stopped once the defendant went to jail, (see Government's Hearing Exhibit 16, p. 9), but started again around August 2016. (See Government's Hearing Exhibit 16. pp. 10, 24). At the time, the defendant trusted Cherry based upon their past drug relationship, (see Government's Hearing Exhibit 16, p. 15), and would "front" the drugs to Cherry for payment later. (See Docket Entry 125, p. 25, Trial Transcript of Donnell Cherry).

During this time, if the defendant didn't bring the cocaine directly to Cherry, he would have someone else drop it off at Cherry's house, or have Cherry come to the defendant's house. (See Government's Hearing Exhibit 16, pp. 12, 19, 21-22). On at least one occasion, the defendant brought cocaine to Cherry's house, while accompanied by Geneva Smith. (See Government's Hearing Exhibit 16, pp. 22-23).[5] This relationship between Cherry and the defendant lasted until November 9, 2016, the day Cherry's house was raided by the ECSD. (See Government's Hearing Exhibit 16, p. 9, 25).   After the raid, Cherry met with the defendant who wanted to know what happened. , (See Government's Hearing Exhibit 16, p. 33). Later, Cherry heard that the defendant believed he "snitched" and put a $20,000 "contract hit" on Cherry's life.  (See Government's Hearing Exhibit 16, p. 35). After Cherry's house was raided, he began to cooperate with the ECSD. (See Docket Entry 125, pp. 35-36, Trial Transcript of Donnell Cherry). Eventually Cherry testified before the federal grand jury, and at trial.

---

[5] Cherry did not know the identity of the woman at the time, but later identified her as Geneva Smith, when a photo of her was displayed on news after she was arrested with the defendant. (See Government's Hearing Exhibit 16, pp. 22-25).

On November 16, 2016, ECSD, a short time after the raid on Cherry's house, Detective Adam Imiola obtained a search warrant for the defendant's residence, located at 489 Emerson Dr., Amherst, New York.  This warrant was obtained after Detective Imiolo brought a confidential informant (CI) before a Judge in order to provide probable cause in support of the warrant for Pennick's house.[6]  After this CI provided such information, Erie County Supreme Court Judge Timothy J. Drury signed a search warrant authorizing the search of 489 Emerson Dr., Amherst, New York.

The next day, on November 17, 2016, Detective Imiolo received information from the same CI, who advised that the defendant was in possession of a large quantity of narcotics. The CI further advised Detective Imiolo that at a certain time in the near future, an unidentified African-American female would be going over to Pennick's house in a "dark-colored maroon boxy-type vehicle" to pick up the narcotics and deliver them to another unknown individual somewhere else in the city of Buffalo, New York.  After the call, Detective Imiolo immediately relayed this information to Senior Detective Daniel Granville. Due to the urgency, Detective Imiolo and other members of the ECSD "scrambled" to set up surveillance at Pennick's house as "quick as possible." Approximately 15-20 minutes later, the Detectives observed an African-American woman (later identified as the co-defendant Geneva Smith) arrive in a maroon Ford Flex automobile, and park in the lot directly to the right of Pennick's residence.  This observation was consistent with the information provided by the CI a short time earlier.

---

[6] It is the belief of the government that either this informant, or Cherry was the individual the defendant wanted Phillip Perdue to kill.

Smith was observed exiting the maroon car and enter into Pennick's residence carrying nothing. Approximately 10-15 minutes later Smith was observed exiting the apartment carrying a large purse or bag over her shoulder. Smith then left in her car and was followed by Detective Granville and other members of the ECSD. Smith was observed moving the bag from the front to back seat, and driving erratically. Moments later, Detective Granville had a marked police vehicle pull Smith's car over.

Once Smith's car was pulled over, Detective Granville immediately approached the car and asked her to step out of the car. Believing Smith to be transporting cocaine, Detective Granville then opened the rear door of her car. Detective Granville immediately saw the bag that Smith moved from the front seat. Within this bag, Detective Granville clearly observed a tupperware container containing 2 kilograms of cocaine. Detective Granville then drove the Smith's car and its contents back to the vicinity of 489 Emerson in order to execute the warrant. During the search, evidence was found inside of 489 Emerson, including a metal press, a digital scale, packaging material, baggies, rubber gloves, masks, and a vacuum sealer. In addition, a vacuum sealed bag containing $49,990 was found secreted in the dishwasher.[7] At the time of execution of the search warrant, the defendant Pennick was present in the residence. The defendant stated that the money came from the IRS, and that it was not illegal to possess large sums of money, further mentioning something about a clothing line.

---

[7] At trial, FBI Special Agent Mark Schirching testified that the $49,000 was the equivalent of approximately 2 kilograms of cocaine.

On November 11, 2016, a Criminal Complaint was filed against the defendant and Geneva Smith. (See Docket Entry 1). On November 18, 2016, the defendant was detained.[8] (See Docket Entry 2). Eventually, on January 1, 2017, an Indictment was filed charging Ms. Smith and the defendant. Pre-trial motions were filed and litigated. Eventually, on June 26, 2018, a Decision and Order was filed denying all of the defendant's and Ms. Smith's motions. (See Docket Entry 79). However, prior to this Decision, on June 20, 2018, Ms. Smith was found murdered in the hallway of her apartment, located at 62 Pomona, Pl., Buffalo, New York. (See Hearing Exhibit 18, Buffalo Police Report). The cause of death was listed as a homicide due to a gunshot wound to the head. (See Hearing Exhibit 19, Report of Autopsy).

B. The Sentencing Hearing

On September 28, 2020, and September 29, 2020, a sentencing hearing was conducted before this Court. At the hearing, the government called several witnesses to testify as to various factors relevant to the defendant's sentencing. In addition, the government offered several items of evidence, including reports and prior testimony, in support of their positon. The government relies on all of the testimony and submissions offered by the government to support their position on sentencing. However, for purposes of this memorandum, the government will highlight the testimony of Special Agent Marcello Falconetti, Rodney Hill, and Phillip Purdue.

---

[8] As a result of the search, the defendant was arrested on November 17, 2016, and was no longer on pre-trial release from Indictment 10-CR-191-A.

1.  Special Agent (SA) Marcello Falconetti

Special Agent (SA) Marcello Falconetti, of the Federal Bureau of investigation (FBI) testified as to the investigation of the defendant, relevant to Indictment 10-CR-191-A. SA Falconetti testified how several different confidential informants (CI) advised the FBI that, between 2006 and 2008, the defendant and others were obtaining multiple kilograms of cocaine from Atlanta, Georgia, and Houston, Texas. (See Docket Entry 150, pp. 10-11, 33, Hearing Transcript of SA Falconetti). Eventually, in November of 2009, court authorized wire intercept orders were obtained for the telephones of David Manuel and Rodney Hill. (See Docket Entry 150, p. 12, Hearing Transcript of SA Falconetti).

The information obtained from these wire intercepts confirmed that the defendant, Hill, Manual, and others were obtaining multiple kilograms of cocaine from other cities. (See Docket Entry 150, pp. 12-13, Hearing Transcript of SA Falconetti). In order to obtain these large amounts of drugs from these source cites, the defendant would utilize females to transport the money and/or drugs. (See Docket Entry 150, pp. 35-36), Hearing Transcript of SA Falconetti).   In addition, according to SA Falconetti, during the course of the investigation, several seizures of money and large amounts of cocaine were seized from individuals working on behalf of the defendant and others. (See Docket Entry 150, p. 13, Hearing Transcript of SA Falconetti). A summary of these seizures, as testified by SA Falconetti are as follows:

> In **early 2016**, the defendant, Hill, and Henry Lloyd travelled to Atlanta, Georgia to obtain **8 kilogram** amounts of cocaine **two to three times per month**. (See Docket Entry 150, p 34, Hearing Transcript of SA Falconetti).

> The **March 20, 2007,** seizure of **$50,000** (or the equivalent of **2-3 kilograms of cocaine**) from the defendant and Ronald McCarley, in Willoughby Hills, Ohio.(See Docket Entry 150, p. 36, Hearing Transcript of SA Falconetti, and Docket Entry 151, p. 121-122, Hearing Testimony of Rodney Hill).

The **January 1, 2008,** seizure of **34 kilograms of cocaine,** and **3 handguns** from Sharon Jackson in Louisiana. (See Docket Entry 150, p. 37, Hearing Transcript of SA Falconetti, and Docket Entry 151, p. 95, Hearing Transcript of Sharon Jackson).

Testimony that in **February of 2008**, Edward Claybach (uncle to co-conspirator Henry Lloyd), travelled to Houston, Texas, with **$500,000** in order to purchase **30 kilograms of cocaine** for the defendant, Lloyd, and others. (See Docket Entry 150, pp. 39-40, Hearing Transcript of SA Falconetti and Government's Exhibit 11, p. 23, Grand Jury testimony of Henry Lloyd).

The **February 14, 2008**, the seizure of **$364,000**, for the purchase **20 kilograms of cocaine** from Donetta Pride in Texas. (See Docket Entry 150, pp. 12-13, Hearing Transcript of SA Falconetti).[9]

The **May 28, 2009**, seizure of **$109,000 (**for the purchase of **5-6 kilograms of cocaine),** in Houston, Texas. (See Docket Entry 150, pp. 41-42, Hearing Transcript of SA Falconetti).

The **September of 2009**, seizures of **10 kilograms** of cocaine from Mykale King and Evalina Stokes, in Houston Texas.[10] (See Docket Entry 150, pp. 13-14, Hearing Transcript of SA Falconetti).[11]

In addition to the evidence and seizures obtained in this investigation, SA Falconetti was able to obtain admissions from several co-conspirators, including the defendant, charged under Indictment 10-CR-191-A. In particular, SA Falconetti spoke with Rodney Hill, David Manuel, and Henry Lloyd, among others. According to the information provided by these co-conspirators, SA Falconetti learned that between 2006 and 2008, the defendant along with

---

[9] Also confirmed by the grand jury testimony of Donetta Pride, entered into evidence at the hearing as Government's Exhibit 12).

[10] At the time, the street value of this cocaine was approximately $35,000/kilograms ($18,000/kilogram retail). (See Docket Entry 150, p. 17, Hearing Transcript of SA Falconetti).

[11] Cooperating witnesses, as well as the defendant's own admission revealed that he contributed money for these drugs. (See Docket Entry 150, pp. 12-13, Hearing Transcript of SA Falconetti, and Hearing Exhibit).

these other individuals, obtained between **160-170 kilograms of cocaine**. (See Docket Entry 150, p. 42, Hearing Transcript of SA Falconetti).

SA Falconetti also testified as to various admissions the defendant made to him during several proffer sessions. (See Hearing Exhibits 1-10). At the hearing, the government offered the reports of the defendant's admissions. These admissions were offered after SA Falconetti first testified how the defendant violated the terms and conditions of his proffer agreement, by lying about a murder, failing a polygraph, withholding information, and continuing to deal cocaine while on relase. (See Docket Entry 150, pp. 20-29, Hearing Transcript of SA Falconetti).

2. Rodney Hill

At the hearing, the Court also heard testimony from Rodney Hill. Mr. Hill was a co-defendant under Indictment 10-191-A, and one of the defendant's major contributing partner in obtaining cocaine. Mr. Hill testified how in 2006, a little after the defendant got out of jail, he started dealing cocaine with the defendant. (See Docket Entry 151, pp. 116-117, Hearing Transcript of Rodney Hill). At the time, the defendant was on parole. (See Docket Entry 151, pp. 117, Hearing Transcript of Rodney Hill). At the time, Hill and the defendant became partners in obtaining multi-kilogram amounts of cocaine from Atlanta, Georgia. (See Docket Entry 151, pp. 117-118, Hearing Transcript of Rodney Hill). At first, Hill and the defendant obtained **6 kilograms of cocaine** in Atlanta, Georgia. (See Docket Entry 151, p. 118, Hearing Transcript of Rodney Hill).[12] Eventually, that amount increased as the trips to Atlanta

---

[12] At this time, they paid approximately $25,000/kilogram, and made about $40,000/kilogram. (See Docket Entry 151, pp. 117-120, 125, Hearing Transcript of Rodney Hill).

increased. According to Hill, between 2006 and 2007, Hill and the defendant were involved in approximately **10** trips to Atlanta, each time obtaining **25 kilograms of cocaine**, or a total of approximately **250 kilograms**. (See Docket Entry 151, pp. 125-126, 127, Hearing Transcript of Rodney Hill).

Sometime in 2008, Hill testified that he and the defendant started going to Houston, Texas, instead of Atlanta, Georgia, because the cocaine was better. (See Docket Entry 151, p. 128, Hearing Transcript of Rodney Hill). At first, the two obtained **34-35 kilograms,** but once they found a better source of supply, started obtaining more**.** (See Docket Entry 151, p. 129, Hearing Transcript of Rodney Hill). Afterwards, Hill and the defendant stopped working together. However, during this time, Hill and the defendant would, on occasion, work together to obtain cocaine. For instance, on one occasion, the defendant asked Hill to be involved with **15 kilograms**, and **12 kilograms of cocaine** on another occasion**.** (See Docket Entry 151, pp. 138-139, Hearing Transcript of Rodney Hill). On another occasion, Hill and Pennick pooled their money, in the amount of **$300,000**, to obtain approximately **50** kilograms of cocaine. However, that money was intercepted by law enforcement when Hill tried to mail it down to Houston, Texas in an effort to purchase cocaine. (See Docket Entry 151, pp. 140-142, Hearing Transcript of Rodney Hill).

### 3. Phillip Perdue

Phillip Perdue testified that he is currently facing charges under Indictment 20-CR-61-A, and is cooperating with the government in an effort to receive consideration at his sentencing. (See Docket Entry 151, p. 175, Hearing Transcript of Phillip Perdue). Perdue

testified that between March 14, 2018, and May 30, 2018, he was in jail, at the Niagara County Jail, for a probation violation. (See Docket Entry 151, pp. 179-180, Hearing Transcript of Phillip Perdue). During this time at the jail, Perdue saw the defendant, who he had known for about 10-15 years. (See Docket Entry 151, pp. 180-181, Hearing Transcript of Phillip Perdue). According to Perdue, in June or July of 2009, the defendant previously hired Perdue to shoot an individual who shot the defendant. (See Docket Entry 151, pp. 198-200, Hearing Transcript of Phillip Perdue). The defendant originally offered Perdue $50,000 to do the shooting, but only paid Perdue $10,000 since the individual did not die. (See Docket Entry 151, p. 199, Hearing Transcript of Phillip Perdue).

While at the Niagara County Jail with the defendant, Perdue knew the defendant to be facing charges under two separate Indictments; the more recent case involving a female and 2-3 kilograms of cocaine. (See Docket Entry 151, pp. 182-183, Hearing Transcript of Phillip Perdue). The defendant asked Perdue if he knew a certain male individual who the defendant believed to be cooperating against the defendant. (See Docket Entry 151, p. 185, Hearing Transcript of Phillip Perdue). The defendant wanted Perdue to kill that male individual when he got out of prison. (See Docket Entry 151, p. 185, Hearing Transcript of Phillip Perdue).

The defendant also had a conversation with Perdue about the defendant's female co-defendant who go caught with the cocaine.[13] (See Docket Entry 151, p. 186, Hearing Transcript of Phillip Perdue). The defendant told Perdue that the female got caught with the cocaine and brought the police back to his house.[14] (See Docket Entry 15, p. 186, Hearing

---

[13] Perdue could not remember her name and believed it started with a J.
[14] These facts were consistent with the facts of the defendant's 17-CR-15-A case.

Transcript of Phillip Perdue).  The defendant knew that Perdue was soon to be released from jail, and asked Perdue if he would kill this female co-defendant in return for $100,000. Perdue did not kill the woman as he could not "do anything" to women or children. (See Docket Entry 189, p. 175, Hearing Transcript of Phillip Perdue).  Eventually, Perdue found out that the defendant's co-defendant was murdered. (See Docket Entry 151, p. 189, Hearing Transcript of Phillip Perdue).[15]

## II.    THE GOVERNING LAW

Title 18, United States Code, Section 3661 provides that "[N]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of establishing an appropriate sentence."  Accordingly, there is no restrictions on the evidence the Court may receive at the hearing, and the reliability or weight of the evidence is within the discretion of the Court.

Nonetheless, Courts have a statutory obligation to consider the guidelines along with other factors listed in Title 18, United States Code, Section 3553(a). See, United States v. Crosby, 397 F. 3d. 103, 111 (2d. Cir. 2005); Gall v. United States, 552 U.S. 38, 49 (2007). The framework in undertaking the Guidelines calculations is set forth in U.S.S.G.  1B1.1 and, in applying that framework, the judge is obligated to find all facts relevant to calculating the range and make determinations as to the sentencing range that applies to the defendant.  The

---

[15] At the hearing, the government offered evidence of the defendant's co-defendant, Geneva Smith's, murder. (See Government's Exhibits 18-23).

standard of proof for such a determination is preponderance of the evidence, see United States

v. Garcia, 413 F.3d 201, 220 n.15 (2d Cir. 2005).

Pursuant to Guidelines § 1B1.3, "relevant conduct" includes:

(1) (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B)  in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense,

* * * *

(3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions[.]

As is the request below, this preponderance of the evidence standard must be utilized

by the Court in determining government requests for both upward adjustments as well as

upward departures.  See, United States v. Gigante, 94 F.3d 53, 56 (2d Cir. 1996); see also,

United States v. Cordoba-Murgas, 233 F.3d at 708; United States v. Nichols, 912 F.2d 598,

603 (2d Cir. 1990); United States v. Ruggiero, 100 F.3d 284, 290-291 (2d Cir. 1996). While

the Court must apply the preponderance of the evidence standard to its sentencing

determinations, the Court, at a sentencing hearing, is not bound by "all of the strict procedural

safeguards and evidentiary limitations" that apply during a criminal trial.  United States v.

Carmona, 873 F.2d 569, 574 (2d Cir. 1989).  Instead, "[t]he sentencing court's discretion is

'largely unlimited either as to the kind of information he may consider, or the source from

which it may come.'"  United States v. Carmona, 873 F.2d at 574 (quoting United States v. Tucker, 404 U.S. 443, 446 (1972)).  "[W]hen determining sentence," this Court may "rely on evidence given by witnesses whom the defendant could neither confront nor cross-examine." United States v. Carmona, 873 F.2d at 574 (citing Williams v. New York, 337 U.S. 241, 250-51 (1949)).

## A.    __Determining the Base Offense Level__

The base offense level for drug trafficking under the Sentencing Guidelines depends upon the amount of drugs involved. U.S.S.G. § 2D1.1(c). Determining drug quantity is a task for the sentencing court, United States v. Olvera, 954 F.2d 788, 791 (2d Cir.), cert. denied, 505 U.S. 1211 (1992), and in performing that task it is not bound by jury findings or evidence presented at trial, but may consider any reliable proof. See, United States v. Madkour, 930 F.2d 234, 237 (2d Cir.), cert. denied, 502 U.S. 911 (1991).

## B. __The Base Offense Level for the Offense of Conviction Under 17-CR-15-A__

During the trial, the Court heard proof that **2 kilograms of cocaine** were seized from Geneva Smith, who was observed obtaining those drugs from the defendant's residence.  In addition, the jury heard how approximately $49,990 (the equivalent of **2 kilograms of cocaine**) was seized from the defendant's residence.  Donnell Cherry also testified how the defendant sold him between 27-36 ounces of cocaine (9 ounces three to four times) of cocaine. (Trial transcript of Donnell Cherry, p. 28). Therefore, amount of cocaine, specifically relevant to the defendant's conviction under 17-CR-15-A is between 4 and 5 kilograms, which under U.S.S.G, § 2D1.1(c)(6) provides for a base offense level of **28.**

**C. The Base Offense Level Considering Indictment 10-CR-191-A as Relevant Conduct**

As argued at the hearing, the government believes that the defendant's conduct, originally charged under Indictment 10-CR-191-A, is relevant conduct to his convicted conduct under Indictment 17-CR-15-A.  When examining relevant conduct, the sentencing court may also rely on drug amounts "that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2).

The only reason that the defendant was not held accountable to his conduct under Indictment 10-CR-191-A, was because the government elected to dismiss that Indictment, as a result of the defendant's conviction under Indictment 17-CR-15-A.  Nonetheless, the government established that the defendant continually distributed large amounts of cocaine as early as 2006 continuing until the defendant was arrested, on Indictment 10-CR-191-A in 2016, never ceasing unless he was incarcerated.  As such, the government believes that defendant's conduct in Indictment 10-CR-191-A is relevant to his offense level of conviction for Indictment 17-CR-15-A, as the defendant engaged in a common scheme, using the same course of conduct, to continually obtain and distribute large amounts of cocaine.

1. Common scheme

With respect to drug offenses, "all acts and omissions ... that were part of the same course of conduct or common scheme or plan as the offense of conviction" are relevant conduct. U.S.S.G. § 1B1.3(a)(2); United States v. Pellegrini, 929 F.2d 55, 56 (2d Cir. 1991). In our case, the government proved, by a preponderance of the evidence, that the dismissed conduct, under 10-CR-191-A was "part of the same course of conduct or common scheme or plan as the offense of conviction" under 17-CR-15-A. U.S.S.G. § 1B1.3(a)(2); see id., cmt. 5.

This application note to the Guidelines does not provide a comprehensive definition of the term "common scheme or plan." Instead, it simply describes some of the typical or characteristic factors of a "common scheme or plan," suggesting that the uncharged conduct and charged conduct "must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." U.S.S.G. § 1B1.3(a)(2) cmt. 5(b)(i).

While the concept of a common plan or scheme typically requires a mental element linking the series of similar acts with the offense of conviction, no such connection is required for the acts to be considered part of the same course of conduct. See, United States v. Thomas, 54 F.3d 73, 84 (2d Cir. 1995) (distinguishing relevant conduct for sentencing purposes and criminal history calculation); United States v. Perdomo, 927 F.2d 111, 115 (2d Cir. 1991). The Guidelines commentary provides that acts may qualify as being part of the same course of conduct "if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3, comment. (n.5). Relevant factors include "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." Id.

In our case, the government clearly showed that the defendant continually obtained multi-kilogram amounts of cocaine to distribute to others. Not only is the amounts, and type of drugs similar in both Indictments, but the mode in which the defendant obtained and transported the drugs were as well, i.e. use of females.

2. <u>Same course of conduct</u>

Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree or ongoing series of offenses. Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered part of the same course of conduct include the degree of similarity of the offenses, the regularity of the offenses, and the time intervals between the offenses. <u>See</u>, <u>United States v. Dixon</u>, 175 Fed.Appx. 384, 385 (2d Cir.2006). In the Second Circuit, "[a]cts may be found to be part of the 'same course of conduct' if the defendant engaged in a repeated pattern of similar criminal acts, even if they were not performed pursuant to a single scheme or plan." <u>United States v. Thomas</u>, 54 F.3d 73, 84 (2d Cir. 1995); <u>see also Perdomo</u>, 927 F.2d at 115 ("The 'same course of conduct' concept ... looks to whether the defendant repeats the same type of criminal activity over time. It does not require that acts be 'connected together' by common participants or by an overall scheme."). Therefore, the same course of conduct focuses on whether the defendant has been engaged in an identifiable behavior pattern of criminal activity. <u>See</u>, <u>id</u>. at 114.

In our case, even though there is a significant amount of time between the defendant's conduct in both Indictments, that time was tolled due to the defendant's incapacity to sell drugs due to his lengthy incarceration on Indictment 10-CR-191-A. In fact, once the defendant was released on bail, from Indictment 10-CR-191-A, he soon continued in his life-long patter of dealing drugs to Donnell Cherry. This factor is significant given that fact that Donnell Cherry testified that he started dealing drugs with the defendant in 2006, once the defendant got out of jail, and again in 2016, once the defendant was released on bail. Further,

Rodney Hill testified that he started dealing drugs with the defendant in 2006, when the defendant was on parole. Therefore, it is clear that the defendant was simply engaging in a continual patter of similar conduct when he was released on pre-trial release and started dealing drugs again to Donnell Cherry a short time later.

It should be of no import, for relevant conduct purposes, that the 10-CR-191-A indictment was dismissed against the defendant. U.S.S.G. § 1B1.3(a)(2) is to be interpreted broadly to include conduct for which the defendant was acquitted, conduct related to dismissed counts of an indictment, conduct not charged in the indictment and, conduct that predates that charged in the indictment. United States v. Silkowski, 32 F.3d 682, 687 (2d Cir. 1994); United States v. Cousineau, 929 F.2d 64, 68 (2d Cir. 1991) (conduct two years prior to charged conspiracy assessed as relevant conduct); United States v. Jackson, 161 F.3d 24, 28 (D.C. Cir. 1998) (conduct four years prior to charged offense); United States v. Robles, 132 F.3d 34 (6th Cir. 1997) (seven years prior to the charged offense); United States v. Lokev, 945 F.2d 825, 840 (5th Cir. 1991) (conduct dating back five years was relevant in sentencing determination notwithstanding lapse in time, change in membership of conspiracy, or a shifting emphasis in the locale of the operation). This Circuit has found no "doctrinal limitation as to the period during which the 'same course of conduct' may have occurred." United States v. Santiago, 906 F.2d 867, 873 (2d Cir. 1990); see also Jackson, 161 F.3d at 29 (finding "no justification for crafting rigid time limits on the conduct a sentencing judge may consider in making a course-of-conduct determination").

It is the government's view that the criminal conduct charged in Indictment 10-CR-191-A, and those involved in the convicted conduct of Indictment 17-CR-15-A involve a distinct pattern of similar, and continual conduct that only stopped for a short period of time

while the defendant was incarcerated. Once released, the defendant continued to engage in the same pattern of conduct of obtaining multi-kilogram amounts of cocaine by utilizing females as transports. Based upon the 4-5 kilograms of cocaine found as convicted conduct under 17-CR-15-A, and the testimony at the hearing, the government established, by a preponderance of the evidence, that from 2006 continuing until 2017, the defendant's conduct easily involved between 150-450 kilograms of cocaine. As such, under U.S.S.G, § 2D1.1(c)(4) defendant's base level offense would be a level **36.**[16]

If the Court disagrees with this analysis, then the government would offer such evidence as factors for the Court to consider under 18 U.S.C. 3553(a).

### D. <u>The Sentencing Factors Pursuant to Title 18, United States Code, Section 3553(a).</u>

Once the proper guideline range is identified, Title 18, United States Code, Section 3553(a) requires that the Court impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)]. In determining the sentence, the Court must consider, among other things, the nature and circumstances of the offense and the history and characteristics of the defendant; and the need for the sentence imposed to reflect the seriousness of the offense, afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant. <u>See</u> <u>generally</u> 18 U.S.C. § 3553(a). In executing these statutory responsibilities, the Court is obligated to: (1) identify the Guidelines range supported by the facts; (2) treat the Guidelines as advisory; and (3) consider

---

[16] It is believed by the government that under such a finding, the defendant's criminal history would make him a Career Offender.

the Guidelines together with the other factors outlined in 18 U.S.C. § 3553(a).  United States

v. Ratoballi, 452 F.3d 127, 131-32 (2d Cir. 2006).

Therefore, even if the Court disagrees that the 10-CR-191-A criminal acts meet the

definition of relevant conduct, and applicable to the guideline calculation for Indictment 17-

CR-15-A, they should apply to its evaluation of the sentencing factors pursuant to 18 U.S.C.

§ 3553(a).  In our case, relevant factors including the historical and continual dealing of multi-

kilogram amounts of cocaine, as well as the defendant's solicitation to murder another person,

as well as his co-defendant Geneva Smith warrant an upward departure and variance of his

sentencing guidelines.

1. <u>Upward Departure from the Guidelines Range Because Pennick's Criminal History
   Score Does Not Accurately Represent His Criminal History</u>

As it stands, without any determination of past relevant conduct, the defendant's

criminal history category for his conviction under Indictment 17-CR-15-A is a level III. Based

upon the circumstances of the defendant's case, his charged and uncharged criminal history,

the government believes that an upward departure of the defendant's sentence is warranted

based upon the fact that his criminal history score of III, does not accurately represent his

criminal history.

Section 4A1.3 of the Sentencing Guidelines "permits a sentencing court to depart

upwardly when the applicable criminal history category does not adequately reflect the

seriousness of a defendant's criminal past or the real danger of recidivist behavior." United

States v. Thomas, 6 F.3d 960, 963 (2d Cir. 1993). Section 4A1.3(a) (1) states, "[i]f reliable

information indicates that the defendant's criminal history category substantially under-

represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, an upward departure may be warranted."

The Guidelines also provide:

[A] sentencing court may depart from the applicable guideline range if . . . the court finds, pursuant to 18 U.S.C. § 3553(b)(1), that there exists an aggravating . . . circumstance . . . of any kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C. § 3553(a)(2), should result in a sentence different from that described.

U.S.S.G. § 5K2.0(a)(1).

A district court may vary from a Guidelines range pursuant to 18 U.S.C. § 3553(a). See, e.g., United States v. Cavera, 550 F.3d 180, 197 (2d Cir. 2008) (affirming upward variance from Guidelines justified by need for additional deterrence). In considering a request for a variance, a district court may consider any information pertaining to "background, character, and conduct." 18 U.S.C. § 3661. The Court may consider conduct underlying prior convictions, pursuant to § 3553(a)(1). See United States v. Reyes, 691 F.3d 453 460 (2d Cir. 2012).

Such information may include, inter alia, "[w]hether the defendant was pending trial or sentencing on another charge at the time of the instant offense," prior sentences not included in calculating the defendant's criminal history, and "[p]rior similar adult criminal conduct not resulting in a criminal conviction." U.S.S.G. § 4A1.3(a) (2). In determining whether a departure is appropriate, the Court may look to, among other things, "[p]rior similar adult criminal conduct not resulting in conviction," id. § 4A1.3(a)(2)(E), and "[commission of the instant offense while on bail or pretrial release for another serious offense," id. §4A1.3, n. (comment. 2(A)(iv)).

"The inadequacy of a defendant's criminal history category is not merely a permissible basis for an upward departure... [but] an 'encouraged' basis for such a departure." United States v. Simmons, 343 F.3d 72, 78 (2d Cir. 2003) (citing Koon v. United States, 518 U.S. 81, 94-95 (1996)). "In deciding whether to impose a departure on a ground that is encouraged, a sentencing court should ask, '[w]hat features of this case, potentially, take it outside the Guidelines' "heartland" and make of it a special, or unusual, case?'" United States v. Gayle, 389 F.3d 406, 409 (2d Cir. 2005) (quoting Koon, 518 U.S. at 95, which is turn quotes United States v. Rivera, 994 F.2d 942, 949 (1st Cir.1993) (Breyer, C.J.)). "Then, '[i]f the special factor is an encouraged factor, the court is authorized to depart if the applicable Guideline does not already take it into account.'" Gayle, 389 F.3d at 409 (quoting Koon, 518 U.S. at 96).

Thus, the Second Circuit has repeatedly affirmed upward departures where a sentencing court has concluded that a defendant's criminal history category under-represented the gravity of his prior criminal conduct or the likelihood of recidivism. See, e.g., United States v. Delmarle, 99 F.3d 80 (2d Cir. 1996); United States v. Kassar, 47 F.3d 562, 566 (2d Cir. 1995) (overruled on other grounds); United States v. Harris, 13 F.3d 555, 558 (2d Cir. 1994).

Here, there are several reasons why the defendant's criminal history score does not accurately reflect her true criminal history. First, the case against the defendant, under 10-CR-191-A was dismissed. This Court is well aware of the procedural history of that particular case as well as the government's decision to eventually dismiss that Indictment after the conviction of the defendant under the instant Indictment. Nothing in the record indicates that the 10-CR-191-A Indictment was dismissed due to the lack of evidence or obvious innocence of the defendant. Instead, as revealed at the sentencing hearing, the defendant was the leader

and organizer of the cocaine conspiracy charged in the 10-CR-191-A case, admitting to his participation to the FBI. . But for the unforeseen procedural circumstances surrounding the 10-CR-191-A case, the defendant would have easily been convicted for his involvement, and based upon his criminal history, at that time, been sentenced as a Career Offender under § 4B1.1. As such, his criminal history would have automatically calculated at a level VI, instead of III. See. § 4B1.1(b).

Further, as testified to at the hearing, the defendant is a recidivist drug dealer, who since an early age has sold large amounts of cocaine. The defendant was never held accountable for much of this drug dealing history, and continued to engage in it once released from jail, or on court supervision. There are no mitigating circumstances available to the defendant that would warrant a criminal history category of III. Instead, based upon the facts of this case, this Court can easily justify a criminal history category of VI, to adequately address the true nature of the defendant's past criminal history.

**E. Other Applicable enhancements**

The government believes that other enhancements apply to the defendant's guideline, and reserve the right to argue for these enhancements once the Presentence Report is generated. In the meantime, the government believes that the following enhancements should apply to the defendant's offense of conviction.

1.     Obstruction of Justice Enhancement

The defendant's conduct in soliciting the murder of Geneva Smith and the CI warrants an adjustment under Guidelines § 3C1.1 for obstruction of justice. The Sentencing Guidelines provide for a two-level increase in the defendant's offense level if:

(A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense.

U.S.S.G. § 3C1.1. Application Note 4(a) to this section lists as examples of the type of conduct to which the obstruction enhancement applies, "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." See United States v. Sanchez, 35 F.3d 673, 679-80 (2d Cir. 1994) (affirming two-level enhancement under Section 3C1.1 where defendant threatened witness); see also United States v. Rice, 49 F.3d 378, 384-85 (8th Cir. 1995) (same based on threatening telephone calls made by defendant to relative of Government witness). The obstruction adjustment is mandatory once its factual predicates have been established. United States v. Friedman, 998 F.2d 53, 58 (2d Cir. 1993). In our case, the defendant's conduct in soliciting Smith's murder clearly warrants an obstruction of justice enhancement.

2. Role in the Offense Enhancement Pursuant to U.S.S.G. § 2D1.1(b)(16)

Pursuant to U.S.S.G. § 2D1.1(b)(16), if the defendant receives an adjustment under § 3B1.1 (Aggravating Role), and the offense involve one or more of the offenses listed in § 2D1.1(b)(16)(A-E), then a two-level enhancement is appropriate.  In our case, it is clear that more than one of the offenses, listed in U.S.S.G. § 2D1.1(b)(16),, apply to the defendant's relevant conduct. The testimony of Philip Perdue, regarding the defendant's solicitation to murder Geneva Smith implicates 2D1.1(b)(16)(D), while the testimony of SA Falconetti and Rodney Hill, revealing how the defendant continually sold multi-kilogram amounts of cocaine as his livelihood easily implicates the application of 2D1.1(b)(16)(E).  The purpose of

this enhancement is to provide for heightened punishment for the professional criminal. See, United States v. Pristell, 941 F.3d 44, 52 (2d Cir. 2019); see also, United States v. Taylor, 45 F.3d 1104, 1106 (7th Cir. 1995) (the "object of the enhancement is to distinguish the professional from the amateur criminal and punish the former more heavily").

**3.** Maintaining a Premises Enhancement

This two-level adjustment applies to any defendant who "knowingly maintains a premises (i.e., a building, room, or enclosure) for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purpose of distribution." U.S.S.G. § 2D1.1(b)(12) & App. Note 17. Under the convicted conduct for Indictment 17-CR-15-A, it is clear that the defendant, based upon his control of the premises, as well as the evidence found therein (e.g. 2 kilograms of cocaine, baggies, cocaine press, money), maintained his premises for the purpose of distributing and storing cocaine.

**4.** Leadership Role in the Offense

Section 3B1.1(a) provides for a four-level increase in offense level "[i]f the defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a) (2001). Prior to imposing a leadership enhancement under section 3B1.1(a), a sentencing court must make "specific factual findings that (i) the defendant was an organizer or leader, and (ii) the criminal activity involved five or more participants, or was otherwise extensive." United States v. Escotto, 121 F.3d 81, 85 (2d Cir.1997).

Although the criminal activity at issue must involve five or more participants or be otherwise extensive, the Sentencing Guidelines only require that the defendant be an organizer or leader of one or more of those participants for the section 3B1.1(a) enhancement to be appropriate. See United States v. Zichettello, 208 F.3d 72, 107 (2d Cir.2000). In our case, if Indictment 10-CR-191-A is considered relevant conduct then the defendant is subject to the 4 level enhancement under this provision. At a minimum, under the facts of Indictment 17-CR-15-A, the defendant organized Geneva Smith, subjecting him to, at least, the 2 level enhancement under this provision.

### **Conclusion**

The government respectfully submits this post hearing memorandum to assist the Court in its determination of the sentencing factors, and relevant conduct, relating to the defendant's sentence.

DATED:  Buffalo, New York, November 5, 2020.

JAMES P. KENNEDY, JR.
United States Attorney

BY:    s/JOEL L. VIOLANTI
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
(716) 843-5854
Joel.L.Violanti@usdoj.gov