# IN THE DISTRICT COURT OF THE UNITED STATES
# FOR THE WESTERN DISTRICT OF NEW YORK

THE UNITED STATES OF AMERICA,

-vs-

**DEFENDANT'S POST-HEARING SUBMISSIONS**

TYRONE PENNICK,

                              Defendant.       17-CR-0015A

The government first contends that before any sentencing enhancements, the defendant's criminal history category is a level III, without showing its work or providing the basis for this conclusory claim. Defendant contends, with equal authority, that his criminal history category is a level II.

The government goes on to contend, contrary to the proof at trial, that 4-5 kilos of cocaine was found as the conduct of conviction under the instant indictment. The actual drug quantity at issue at trial was 2 kilos; the government's higher calculation relies on the Court's willingness to convert cash seized to drug weight and to adopt the government's argument as to the weight represented by the amount of cash seized, a conversion that the Court has not yet adopted and which the defendant contests.

Even if the Court were willing to convert seized cash to drug weight, defendant contends that even with that conversion, the drug weight in question would be between 2 and 3.5 kilos (an offense level 26) rather that 4-5 kilos (an offense level 28) as the government claims.

The government goes on to suggest, absent any authority, that on the basis of defendant's prior alleged conduct (not convictions) which the government contends should be considered as relevant conduct for sentencing purposes, the defendant's criminal history, factoring in that conduct would make him a career offender.  The government declines to suggest how the Court could make such finding based on conduct, not convictions.  Contrary to the government's claims "the career offender guidelines are to be strictly construed in favor of the defendant" (*United States v. Butler*, 970 F.2d 1017, 1026 [2nd Cir. 1992] citing *United States v. Liranzo*, 944 F.2d 73, 79 [2nd Cir. 1991]).

Tacitly acknowledging that this argument will likely fail, the government goes on to argue for sentencing enhancements under 18 U.S.C. § 3553(a) based conduct that it contends qualifies as "relevant conduct" for sentencing purposes.  The government first contends that defendant's prior unproven drug activities charged in the now-dismissed indictment 10-cr-191 represent relevant conduct for sentencing purposes.

At the sentencing hearing the government relied on the testimony of Special Agent Marc Falconetti, who reported claims made by "several" unidentified confidential informants not otherwise supported by any proof (presumably to secure favorable treatment with respect to their own pending charges) that defendant was involved in drug dealing between 2006 and 2008.  According to Agent Falconetti this information led to the investigation of the defendant and others for possession and distribution of controlled substances, culminating in indictment 10-cr-191.

Former codefendants under indictment 10-cr-191 Rodney Hill and Sharon Jackson also testified at the hearing about the defendant's alleged activities, and their's, relating to that indictment, all of which ceased at the latest, upon the filing of the criminal complaint leading to indictment 10-cr-191.  They had no more current information to offer.

Based on this proof, the government now argues that the Court should consider defendant's alleged conduct in relation to indictment 10-cr-191 as relevant conduct when calculating the defendant's sentence for his conviction in this case.

In its pre-hearing memorandum, the government conceded that proof of defendant's prior conduct as charged in indictment 10-cr-191 does not really qualify as relevant conduct under a "common scheme or plan" theory since, "[f]or two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi" (U.S.S.G. § 1B1.3 Application Note 9[A]; *see United States v. LaBarbara*, 129 F.3d 81, 86 [2nd Cir. 1997]; *United States v. Walsh*, 119 F.3d 115, 121 [2nd Cir. 1997]).  Thus a defendant's uncharged conduct may be considered part of a common scheme or plan when it involves, for example, a common victim, a common time period and a common type of merchandise, factors not present in this case (*United States v. Martin*, 157 F.3d 46, 49-50 [2nd Cir. 1998]; *see also United States v. Zehm*, 217 F.3d 506 [7th Cir. 2000]; *United States v. Mak*, 962 F.2d 112 [1st Cir. 1991]).

In its post-hearing memo, the government changes its tune, now attempting to shoehorn allegations of defendant's temporally remote activities as charged in indictment 10-

cr-191into a common scheme or plan theory of relevant conduct despite the absence of factors supporting that theory.

According to the government's proof at the hearing, during the commission of the offenses alleged in indictment 10-cr-191, Mr. Pennick and his codefendants used women (and men too) to transport drugs or money, and also transported drugs or money themselves without using any intermediaries.  Allegedly at times the defendant and others including Mr. Hill, would pool their money to make a single larger multi-kilo purchase of cocaine then divide the total amount according to how much each had contributed, before redistributing the cocaine obtained from other jurisdictions in the Buffalo area.

Based on the proof at the trial of the present case, the defendant allegedly possessed and distributed (but wasn't charged with) ounce up to kilo level quantities of cocaine and on one occasion allegedly used the female codefendant to assist in distribution.

There was nothing remarkable about the activities described in the present case or in indictment 10-cr-191 that could support a finding of a common scheme or plan.  Rather, the use of "mules" (male or female) to deliver drugs or money, the pooling of resources to obtain larger quantities of drugs and obtaining cocaine from outside of the jurisdiction, far from being unique, are features found in virtually every run of the mill drug dealing operation and are not sufficiently singular to fall within the ambit of a common scheme or plan.

Also removing the activities from the common scheme or plan classification, there were no alleged associates in common between the current case and the activities alleged in indictment 10-cr-191 (*see, e.g. United States v White*, 447 F.3d 1029 [8th Cir. 2006]).

As acknowledged in the government's pre-hearing memorandum, defendant's prior conduct may be considered relevant conduct, if at all, on the theory that it involved the "same course of conduct," which "looks to whether the defendant repeats the same type of criminal activity over time" and does not require the same temporal relationship between the acts or the commonality of participants required for a common scheme or plan (*United States v. Burnett*, 968 F.2d 278, 280 [2nd Cir. 1992]).  There are three reasons why the Court should decline to find that the conduct alleged by the government qualifies as the same course of conduct for relevant conduct purposes.

First, when considering any arguably relevant conduct and the weight to afford it, if any, "the preponderance standard is no more than a *threshold* basis for adjustments and departures, and the weight of the evidence, at some point along a continuum of sentence severity, should be considered" (*United States v. Gigante,* 94 F.3d 53, 56 [2nd Cir. 1996] [emphasis in original], *see also United States v. Vaughn, supra*).

In *United States v. Shonubi*, 998 F.2d 84, 89-90 [2nd Cir. 1993], the Second Circuit held that the 54 month sentence increase sought based on relevant conduct was "significant" and that such a dramatic sentencing enhancement warrants the application of a higher standard than mere preponderance to the sentencing court's finding of relevant conduct (*id.*). This holding is in accord with the Supreme Court's ruling that in the case of upward departures, "the preponderance standard is no more than a *threshold* basis for adjustments and departures, and the weight of the evidence, at some point along a continuum of sentence severity should be considered with regard to both upward adjustments and upward

departures" (*United States v. Watts*, 519 U.S. 148, 157 n. 1 [1997], quoting *United States v. Gigante*, 94 F.3d 53, 56 [2nd Cir. 1996]; *see also United States v Koczuk*, 166 F.Supp.2d 757, 761 [E.D.N.Y. 2001]).

This same safeguard applies where the defendant contests the quantity of drugs in a narcotics case or the amount of the loss in a financial crime (*see United States v. Colon*, 961 F.3d 43 [2nd Cir. 1992] [at sentencing the government bears the burden of proving drug quantity by a preponderance of the evidence]). In this regard, the district court's underlying factual findings cannot be "predicated on surmise or conjecture," but rather the court must engage in a "careful practice" of looking at specific evidence – e.g. drug records, admissions or live testimony – to calculate drug quantities for sentencing purposes" (*United States v. Shonubi*, 998 F.2d 84, 89-90 [2nd Cir. 1993]).

Defendant contends that the government's proof fails to meet the preponderance standard (*see Witt v. United States*, 515 U.S. 389, 401 [1995]; *United States v. Cordoba-Murgas*, 233 F.3d 704 [2nd Cir. 2000]; *United States v. Montalvo*, 467 F.Supp.3d 166 [W.D.N.Y. 2020]), much less the more stringent standard suggested by *Watts* and its progeny applicable to the significant sentencing enhancement the government seeks in this case (*see United States v. Archer*, 671 F.3d 149, 165 [2nd Cir. 2011]; *United States v. Montalvo, supra*).

Second, the government now attempts to avoid the sanction imposed for its violation of defendant's constitutional speedy trial rights relative indictment 10-cr-191 violation by using the conduct alleged in that indictment to enhance defendant's sentence in this case.

While the Second Circuit has permitted a district court to use even acquitted conduct for sentencing purposes if, at minimum, such conduct is proven by a preponderance of evidence (*see United States v. Martinez,* 769 Fed. Appx. 12 [2nd Cir. 2019]; *accord United States v. Gotti*, 767 Fed. Appx. 173 [2019]; *United States v. Vaughn*, 430 F.3d 518, 527 [2nd Cir. 2005]), the practice has not been universally accepted. In *Martinez*, for example, there was a forceful concurrence decrying the "fundamentally unfair" use of acquitted conduct to increase a defendant's sentence ". . . based on facts the judge finds without the aid of a jury or the defendant's consent" (*United States v. Martinez*, 769 Fed. Appx. at 17 [Pooler J. concurring], quoting *United States v. Sabillon-Umana*, 772 1328, 1331 [10th Cir. 2014]).

But the supposed relevant conduct in this case is not acquitted conduct that the government was able to present to a jury but failed to present proof of beyond a reasonable doubt. Rather, the conduct upon which the government now seeks to rely could not be presented to a jury because of the dismissal of the only counts charging the defendant in indictment 10-cr-191, based on the government's violation of the defendant's constitutional right to a speedy trial. Although the government now seeks to end-run around the sanction for its violation of defendant's constitutional rights by continuing to benefit from the allegations it was prevented from presenting to a jury, it should not be permitted to enhance the defendant's sentence by avoiding the sanction of dismissal for its constitutional speedy trial violation on indictment 10-cr-191, effectively nullifying any penalty for violation of the defendant's constitutional speedy trial rights (*see e.g. United States v. Tropiano*, 50 F.3d 157 [2nd Cir. 1995]; *United States v. Kim*, 896 F.2d 678 [2nd Cir. 1990]).

Third, based on the controlling cases, there remains *some* temporal relationship requirement to make out a course of conduct, albeit not as stringent as that for a common scheme or plan.  Not every similar act from a defendant's date of birth until the present day may be classified as the "same course of conduct" for sentencing purposes (*see, e.g. United States v Zehm*, 217 F.3d 506 [7th Cir. 2000] [acts in acquitted counts that were "virtually simultaneous" with acts in counts of conviction qualified as "same course of conduct" relevant conduct]; see also *United States v. Santiago*, 906 F.2d 867 [2nd Cir. 1990] [Eight months was "considerably longer" than most other Second Circuit cases]; *United States v. Thomas*, 54 F.3d 73 [2nd Cir. 1995]; *United States v. Adams*, 303 F. Appx. 926, 927 [2nd Cir. 2008]).

As argued in defendant's pre-hearing memorandum, there must be some limit, not currently well-defined by the Second Circuit, for how remote conduct may be and still be counted as part of the same course of conduct and therefore relevant conduct for sentencing. Whatever that limit is, no other case has come remotely close to considering conduct seven years removed from the offense of conviction as part of the same course of conduct for sentencing purposes, and neither should this Court.  Further, the government's proof failed to establish that the hiatus between the prior alleged conduct and the offense of conviction was "short," as the government claims.

In this regard, the government relied on the prior testimony of Donnell Cherry, although that testimony defeated the government's claim that defendant's offenses of conviction are part of the same course of conduct as the conduct alleged in indictment 10-cr-

191 or before. Mr. Cherry claimed that he initially received cocaine from the defendant years before the activities alleged in indictment 10-cr-191. Although the government now suggests that Mr. Cherry was dealing with the defendant at the time of the activities alleged in that indictment, he didn't testify to that and the government offered no other proof in support of this claim.

Instead, Mr. Cherry testified that he did not renew his drug relationship with the defendant until 2016, two years after the defendant was released from his pretrial detention under indictment 10-cr-191. The government offered no other evidence to support its claim of defendant's "continuous drug dealing" during this two year period (central to its argument that defendant's prior acts represent the same course of conduct and may be counted for relevant conduct purposes). By contrast, the record is replete with efforts by the defendant to either obtain a curfew or otherwise relax the conditions of his home confinement in order to engage in documented and legitimate employment opportunities, actions inconsistent with the government's claims of an unbroken history of engaging in drug dealing, interrupted only by incarceration.

Apart from the unprecedented gap in time between the conduct of conviction and the conduct the government asks the Court to rely on as relevant conduct, the government's claim that defendant's unquestionably remote alleged conduct involves "a distinct pattern of similar and continual conduct that only stopped for a short period of time while the defendant was incarcerated" does not hold water. As noted above and in defendant's pre-hearing memorandum, defendant's alleged conduct – using women to transport quantities of cocaine

– is so far from being "distinct" that one would be hard-pressed to find a drug distribution operation that does not employ this technique (*see e.g United States v. Santiago, supra* [relevant conduct that preceded offense conduct by eight months at the same location using the same modus operandi could be counted for sentencing purposes]).

The government goes on to assert that the Court should apply additional sentencing enhancements because, in the government's view, the defendant's criminal history under-represents his criminal conduct (*see* guideline 4A1.3[a]), although it's not clear from the government's memo just what it believes defendant's criminal history is.

In support of this argument, the government encourages the Court to double-count, for sentencing enhancement purposes, facts upon which the defendant will already be sentenced based on his offenses of conviction, contrary to the 18 U.S.C. § 3553(b)(1) directive that the sentencing court may consider circumstances of any kind "*not* adequately taken into consideration by the Sentencing Commission in formulating the guidelines . . ." [emphasis added].

For example, the government asks the Court to enhance the defendant's sentence under this theory based on defendant's commission of the instant offense while on bail or pretrial release, facts upon which the defendant will already be sentenced based on his conviction under count 4 of the indictment. Likewise, the government asks the Court to enhance defendant's sentence under § 3553 for maintaining a drug-involved premises, conduct for which the defendant will be sentenced based on his conviction under count 3 of the indictment. The Court should reject the government's invitation to double-count, for

sentencing purposes, conduct that has been adequately considered by the Sentencing Commission in formulating the guidelines.

The government next makes the novel argument that the Court should enhance the defendant's sentence for acting as an organizer or supervisor, not with respect to the conduct of conviction, but based solely on what the government claims is defendant's prior relevant conduct. The government cites no authority for the proposition that the Court can enhance the defendant's sentence based on his alleged status as organizer during behavior alleged as relevant conduct. Even if there were a legal basis for the government's request, the government has failed to prove at the sentencing hearing that the defendant in fact acted as an organizer or supervisor and defendant's conduct as alleged at the sentencing hearing, even if properly proven by the government, would not qualify for an organizer or supervisor enhancement under guideline section 3B1.1 (*see United States v. McGregor*, 11 F.3d 1133 [2nd Cir. 1993]).

In the alternative, the government argues that the Court should apply this 4 level organizer enhancement based on its claim that, for the present indictment, the defendant "organized" the codefendant. But when making this argument, the government elides over the requirement that the criminal activity at issue must involve 5 or more participants, which was never even suggested by the trial proof or at the sentencing hearing. Therefore, this adjustment cannot be sustained based on the complete absence of the government's proof to support it.

The government further asserts in its post-hearing memorandum that although the defendant has not been charged in the death of his former codefendant, the Court should punish him for causing that death by applying an obstruction of justice enhancement under guideline section 3C1.1.

In this regard, the government relies on the testimony of Philip Perdue, a cooperating informant trying to obtain his own sentencing benefit through cooperation, who has no knowledge of who caused Ms. Smith's death or why, or what relationship if any the defendant had to her death, but who allegedly participated in a single conversation with the defendant in the Niagara County Jail relative to Ms. Smith and the defendant's supposed desire to have her killed.

The government offers nothing apart from speculation that the defendant feared Ms. Smith's testimony or had any motive for her murder and supposedly, according only to Mr. Perdue, solicited Mr. Perdue – a career criminal in his own right – to commit the act.  But Mr. Perdue's testimony was incredible.  According to him, the defendant previously solicited him to kill another person for $50,000 but when he only injured the intended target, defendant made only a partial payment of $10,000.  According to Mr. Perdue, the defendant then sought to hire him again, the same man who botched the previous job, to kill Ms. Smith, a codefendant who Mr. Pennick had no reason to want to be unavailable at trial.

The government's theory was always that 2 kilos of cocaine found in Ms. Smith's overnight bag following a traffic stop belonged to the defendant; the government was pursuing that theory, as it did at trial, with or without Ms. Smith's cooperation.  The only

evidence the could have been offered to contradict that theory would have been Ms. Smith's testimony, who could have claimed that the cocaine seized from her overnight bag was hers (either personally or was a delivery for another) not the defendant's, testimony that only Ms. Smith could have offered and which would have benefitted Mr. Pennick had she done so.

Mr. Perdue had no information beyond his supposed jail conversation with the defendant although he was released from jail approximately a month before Ms. Smith was killed. He had no information about who was involved or why, nor did he have any information linking the defendant to that crime. The government also offered no proof that the defendant attempted to threaten, intimidate or otherwise unlawfully influence the codefendant, the language from section 3C1.1 application note 4(a) that it seeks to rely on. In short, the government failed to offer any proof sufficient to satisfy its burden for relevant conduct purposes that could link the defendant to Ms. Smith's death.

Finally, the government also offered FBI 302 reports reflecting statements made by the defendant during proffer sessions following his arrest on the criminal complaint leading to indictment 10-cr-191. Despite the clear language of the proffer agreement pursuant to which they were made which precludes the use of any such statements at any sentencing proceeding, the government now violates the express language of that agreement ("the government agrees not to use any statements or tangible objects provided by the witness directly against that witness, in any proceeding, *including any sentencing proceeding . . .*" [italics added]) by encouraging to the Court to consider those statements for sentencing purposes.

Although the government's argument on this issue is unclear, it apparently contends that where a defendant has entered into a proffer agreement, he (although not the government) is bound by the terms of that agreement – such as to report to the government his own criminal conduct – for the rest of his life, regardless of whether the defendant continues or stops cooperating with the government or whether the prosecution that gave rise to the agreement has concluded. Unsurprisingly, the government cites no authority for this novel proposition.

Because by its plain language the proffer agreement bars the government's use of the defendant's proffered statements for the purpose that the government now seeks to use them, the Court should refuse to consider them when determining the defendant's sentence.

Dated: November 22, 2020

<div style="margin-left:40%">

Respectfully submitted,
s/ Donald M. Thompson
DONALD M. THOMPSON, ESQ.
Attorney for TYRONE PENNICK

</div>