IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

           v.                                  17-CR-15-A

TYRONE PENNICK
              Defendant.

**GOVERNMENT'S RESPONSE TO DEFENDANT's OBJECTIONS TO THE PSR**

    **I.**        **PRELIMINARY STATEMENT**

On October 17, 2018, the defendant was found guilty, by a jury, of all counts in the Indictment 17-CR-15-A. On September 28, 2020 and September 29, 2020 a sentencing hearing was conducted before this Court. At the hearing, the government called several witnesses to testify as to the defendant's continuous and historical drug dealing, and the relation it had to his convicted conduct. In addition, the government called a witness who testified as to the defendant's solicitation to murder his co-defendant on Indictment 17-CR-15-A.

On August 2, 2021, the Court filed a Decision and Order regarding the sentencing hearing, and the sentencing factors. (See Docket 164). On August 12, 2021, the United States Probation Department (USPD), filed a Presentence Investigation Report (PSR). (See Docket 165). On November 2, 2023, the defense file Objections to this PSR. (See Docket 204). On

January 30, 2024, the USPD filed a Revised PSR. (See Docket 209).  The Court ordered the government to file a response to the defense objections. (See Docket Entries 208 and 211).


## II.   OBJECTIONS


Objection to the testimony of Donnell Cherry


The defendant Objected to the Court's consideration, and reliance on the testimony of Donnell Cherry contained in paragraphs 14 and 15 of the Revised PSR.  The defense claims that they never received any notes or recordings of an in-camera testimony, made by Mr. Cherry, to a state court Judge, in support of a search warrant. The defense speculates that the in-camera testimony of Mr. Cherry, if it exists, would show that the Mr. Cherry was untruthful to the issuing Judge, claiming that he obtained controlled substance from someone other than the defendant. (See Docket Entry 204, p. 2). The defense further claims that they have a good faith basis for this speculative allegation. However, as noted in the Magistrate Judge's Report and Recommendation (R&R), the Magistrate Judge found that the government was not, at that time, obligated to turn over any information relating to the confidential informant (CI), and that the defendant (Pennick) lacked standing to challenge the search warrant. (See Docket Entry 61, pp 9-10).


Further, at trial, the government never relied on any in-camera testimony of Mr. Cherry. Instead, Cherry personally testified at trial, subjecting himself to cross examination, regarding any prior statements he may or may not have given. At trial, Donnell Cherry

testified that, during the time of Pennick's release on bail (around the summer of 2016), Pennick sold him multiple ounces of cocaine. (See Docket Entry 125, p. 23, Trial Transcript of Donnell Cherry).[1] Eventually, on November 9, 2016, Cherry's house was raided by the Erie County Sheriff's Department (EDSD), where 4 ½ ounces (known on the street as a "Big 8"), where found. (See Docket Entry 125, pp. 5-6, Trial Transcript of Donnell Cherry). According to Cherry, these 4 ½ ounces were the remainder of the 3 "Bigs" (total of 18 ounces) that the defendant provided a week prior to the search. (See Trial Transcript of Donnell Cherry, pp. 5-7).[2]

Although limited by an evidentiary ruling at trial, (Docket Entry 125, pp. 9-22), Cherry testified before the grand jury that, when he was approximately 17 or 18 years old (from 1998-2000), the defendant gave him cocaine to sell. (See Government's Hearing Exhibit 16, pp. 5-9, Grand Jury Testimony of Donnell Cherry).[3] At that time, the defendant would give Cherry approximately a ½ ounce of cocaine to sell. (See Government's Hearing Exhibit 16, p. 8). This drug relationship stopped once the defendant went to jail, (see Government's Hearing Exhibit 16, p. 9), but started again around August 2016. (See Government's Hearing Exhibit 16. pp. 10, 24). At the time, the defendant trusted Cherry based upon their past drug

---

[1] Cherry did not know the exact date that he started dealing with the defendant, at this time, but testified that it was "about three, four months before" the time his house was raided by the Erie County Sherriff's, which occurred in November of 2016. (See trial transcript of Donnell Cherry, pp. 4, 23-24).

[2] Cherry owed the defendant $16,000 for the 3 "Bigs" (18 ounces) of cocaine. (Trial Transcript of Donnell Cherry, p. 7).

[3] Cherry testified before the grand jury that he was born in 1982. (See Government's Hearing Exhibit 16, p. 2).

relationship, (see Government's Hearing Exhibit 16, p. 15), and would "front" the drugs to Cherry for payment later. (See Docket Entry 125, p. 25, Trial Transcript of Donnell Cherry).

Cherry testified that if the defendant didn't bring the cocaine directly to Cherry, he would have someone else drop it off at Cherry's house, or have Cherry come to the defendant's house. (See Government's Hearing Exhibit 16, pp. 12, 19, 21-22).[4] On at least one occasion, the defendant brought cocaine to Cherry's house, while accompanied by Geneva Smith. (See Government's Hearing Exhibit 16, pp. 22-23).[5] This relationship between Cherry and the defendant lasted until November 9, 2016, the day Cherry's house was raided by the ECSD. (See Government's Hearing Exhibit 16, p. 9, 25).  After the raid, Cherry met with the defendant who wanted to know what happened. , (See Government's Hearing Exhibit 16, p. 33). Later, Cherry heard that the defendant believed he "snitched" and put a $20,000 "contract hit" on Cherry's life.  (See Government's Hearing Exhibit 16, p. 35). After Cherry's house was raided, he began to cooperate with the ECSD. (See Docket Entry 125, pp. 35-36, Trial Transcript of Donnell Cherry). Eventually Cherry testified before the federal grand jury, and again at trial.

On November 16, 2016, ECSD, a short time after the raid on Cherry's house, Detective Adam Imiola obtained a search warrant for the defendant's residence, located at 489 Emerson Dr., Amherst, New York.  This warrant was obtained after Detective Imiolo

---

[4] Testimony that the defense claims is contained in Cherry's in camera testimony.
[5] Cherry did not know the identity of the woman at the time, but later identified her as Geneva Smith, when a photo of her was displayed on news after she was arrested with the defendant. (See Government's Hearing Exhibit 16, pp. 22-25).

brought a confidential informant (CI) before a Judge in order to provide probable cause in support of the warrant for Pennick's house.[6]  This CI was not Cherry. After this CI provided such information, Erie County Supreme Court Judge Timothy J. Drury signed a search warrant authorizing the search of 489 Emerson Dr., Amherst, New York.

The next day, on November 17, 2016, Detective Imiolo received information from the same CI (not Cherry), who advised that the defendant was in possession of a large quantity of narcotics.  Geneva Smith was then observed exiting the defendant's residence with a bag. Ms. Smith was subsequently stopped and found to be in possession of 2 kilograms of cocaine. A search of the defendant's residence was executed. During the search, a metal press, a digital scale, packaging material, baggies, rubber gloves, masks, a vacuum sealer, and $49,990 was found.

In his Objection to the PSR, Pennick claims that the failure of the government to produce any in-camera state court testimony of Cherry, prevented him the "opportunity to "challenge information that the Court is being asked to consider when determining his sentence." (See Docket 204, p. 2).  Such is not the case. Even if such in-camera testimony existed, it was not the obligation of the government to turn it over as Jencks material, as it was not in their possession.[7]  A party is not obligated to produce a requested statement unless it is in the party's possession. 18 U.S.C. § 3500(B), Fed. R. Crim. P.  Here, any existing in-

---

[6] The government never provided the identity of this CI to the defense, nor did this CI testify at the trial.

[7] In-camera testimony of a CI, is preserved in the possession of the issuing state court Judge. Absent a Court Order, the government can not obtain such testimony.

camera testimony of Mr. Cherry, would have been in the possession of the issuing state court Judge, not the government. As such, the requested statement is not Jencks. It is well established that the government's "discovery and disclosure obligations extend only to information and documents in the government's possession." United States v. Brennerman, 818 F. App'x 25, 29 (2d Cir. 2020) (summary order).

Moreover, Cherry testified at trial, and was available for cross examination. At trial, Cherry testified to the fact that Pennick didn't always personally bring him the drugs; the same type of testimony that Pennick claims is contained in the un-produced, in camera testimony. As a result, the defense Objections to the Court's consideration of the testimony of Donnell Cherry, as presented at trial, and contained in paragraphs 14 and 15 of the PSR should be denied.

Objection to the Obstruction Enhancement and testimony of Phillip Purdue

The defense next Objects to the information contained in paragraphs 16, 17, and 27 of the PSR relating to testimony of Phillip Purdue. (Docket Entry 204, p. 7). Specifically, the defense claims that Mr. Purdue's uncorroborated testimony relating to a jail conversation with Pennick is "not sufficiently reliable to support a sentencing enhancement for obstruction of justice, as recommended in paragraph 27 of the PSR.

USSG §3C1.1 provides for a two-level increase in the offense level where: 1) the defendant willfully obstructs justice with respect to the investigation, prosecution or

sentencing of the offense of conviction, and 2) the obstructive conduct relates to the offense of conviction, any relevant conduct, or a closely related offense.  Although a simple denial of guilt doesn't trigger this application, See, §3C1.1, comment. (n. 2), it does apply when a defendant falsely testifies on a material issue at a suppression hearing, United States v. Giraldo, 80 F.3d 667, 680 (2d Cir. 1996), or makes a false statement in an affidavit in support of a motion to suppress, United States v. Ahmad, 202 F.3d 588, 593 (2d Cir. 2000).

In paragraph 27 of the PSR, the USPD correctly found that a two level enhancement under USSG §3C1.1 applies because the defendant "engaged in serious and substantial conversations with Phillip Purdue to solicit him to kill co-defendant Geneva smith, in return for $100,000, which was intended to stop her from testifying against the defendant in the instant offense." Such an enhancement is easily applicable considering the testimony of Phillip Purdue at the sentencing hearing.

At the hearing, Phillip Perdue testified that between March 14, 2018, and May 30, 2018, he was in jail, at the Niagara County Jail, for a probation violation. (See Docket Entry 151, pp. 179-180, Hearing Transcript of Phillip Perdue).  During this time at the jail, Perdue saw the defendant, who he had known for about 10-15 years. (See Docket Entry 151, pp. 180-181, Hearing Transcript of Phillip Perdue).  In fact, according to Perdue, in June or July of 2009, the defendant previously hired Perdue to shoot an individual who shot the defendant. (See Docket Entry 151, pp. 198-200, Hearing Transcript of Phillip Perdue).  The defendant originally offered Perdue $50,000 to do the shooting, but only paid Perdue $10,000 since the individual did not die. (See Docket Entry 151, p. 199, Hearing Transcript of Phillip Perdue).

While at the Niagara County Jail, Perdue knew the defendant was facing charges under two separate Indictments; the more recent case involving a female and 2-3 kilograms of cocaine. (See Docket Entry 151, pp. 182-183, Hearing Transcript of Phillip Perdue). Eventually, the defendant asked Perdue if he knew a certain male individual who the defendant believed to be cooperating against the defendant. (See Docket Entry 151, p. 185, Hearing Transcript of Phillip Perdue). The defendant wanted Perdue to kill that male when Perdue got out of prison. (See Docket Entry 151, p. 185, Hearing Transcript of Phillip Perdue).

The defendant also had a conversation with Perdue about the defendant's female co-defendant who go caught with the cocaine.[8] (See Docket Entry 151, p. 186, Hearing Transcript of Phillip Perdue). The defendant told Perdue that the female got caught with the cocaine and brought the police back to his house.[9] (See Docket Entry 15, p. 186, Hearing Transcript of Phillip Perdue). The defendant knew that Perdue was soon to be released from jail, and asked Perdue if he would kill this female co-defendant in return for $100,000. After being releases, Perdue did not kill the woman as he could not "do anything" to women or children. (See Docket Entry 189, p. 175, Hearing Transcript of Phillip Perdue). Eventually, Perdue found out that the defendant's co-defendant was murdered. (See Docket Entry 151, p. 189, Hearing Transcript of Phillip Perdue).[10]

---

[8] Purdue could not remember her name and believed it started with a J.

[9] These facts were consistent with the facts of the defendant's 17-CR-15-A case.

[10] At the hearing, the government offered evidence of the defendant's co-defendant, Geneva Smith's, murder. (See Government's Exhibits 18-23).

For these reasons, the defendant's Objections to paragraphs 16, 17, and the obstruction enhancement recommended in paragraph 27 be denied.

Objection to use of the 2018 U.S.S.G. manual in Paragraph 21

The government agrees with the USPD, and their recommended use of the 2018 U.S.S.G. manual to calculate the defendant's applicable sentencing guidelines. As a result, the defense Objection to paragraph 21 should be denied.

Objection to the grouping of Counts in Paragraph 22

The defense Objects to this recommendation in the PSR, however provides no facts or case law in support of their argument.  However, as set forth in paragraph 22, the USPD correctly grouped Counts 1 and 2 together under § 3D1.2(d), and Count 3 to Counts 1 and 2 under § 3D1.2(c).  Such finding should not be disturbed, and the defense Objection to paragraph 22 denied.

Objection to Paragraph 23, amount of cocaine used to determine the starting offense level

The defense Objects to USPD's finding, in paragraph 23 of the PSR, that 4 kilograms of cocaine, instead of 2 kilograms of cocaine, was used to determine the starting base offense level. Accordingly, the defense argues that the starting base offense level should be a 26, instead of a 28.

The base offense level for drug trafficking under the Sentencing Guidelines depends upon the amount of drugs involved. U.S.S.G. § 2D1.1(c). Determining drug quantity is a task for the sentencing court, United States v. Olvera, 954 F.2d 788, 791 (2d Cir.), cert. denied, 505 U.S. 1211 (1992), and in performing that task it is not bound by jury findings or evidence presented at trial, but may consider any reliable proof. See, United States v. Madkour, 930 F.2d 234, 237 (2d Cir.), cert. denied, 502 U.S. 911 (1991).

During the trial, the Court heard proof that **2 kilograms of cocaine** were seized from Geneva Smith, who was observed obtaining those drugs from the defendant's residence.  In addition, the jury heard how approximately $49,990 (the equivalent of **2 kilograms of cocaine**) was seized from the defendant's residence.  Further, Donnell Cherry also testified how the defendant sold him between 27-36 ounces of cocaine (9 ounces of cocaine, three to four times). (Trial transcript of Donnell Cherry, p. 28). Therefore, as correctly determined in paragraph 23 of the PSR, the amount of cocaine, specifically relevant to the defendant's conviction, under 17-CR-15-A, is between 4 and 5 kilograms. Under U.S.S.G, § 2D1.1(c)(6), such an amount provides for a base offense level of **28.**

Objection to the Maintaining a Drug Involved Premises enhancement

The defense Objects to the finding, in paragraph 24 of the PSR, that a 2 level enhancement, for maintaining a drug involved premises, under § 2D1.1(b)(12) applies.  The defense makes this claim ignoring the fact that a jury found the defendant guilty of such an offense, under Count 3 in the Indictment.  This two-level adjustment applies to any defendant

who "knowingly maintains a premises for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purpose of distribution." U.S.S.G. § 2D1.1(b)(12) & App. Note 17. The Application Note provides illustrative factors for the Court to consider, neither of which is conclusive, but includes the extent to which the defendant controlled access to, or activities at, the premises.

In our case, the jury found, beyond a reasonable doubt, that the defendant maintained his premise with a purpose of storing, and distributing cocaine. There is no basis in fact, law, or reason to disturb such a finding. As such, the defendant's Objection to this 2 level enhancement should be denied.

Objection to Paragraph 28, Title 18 U.S.C. 3147 enhancement

The defendant Objects to the 3 level enhancement recommended in paragraph 28 of the PSR. The defendant Objects to this enhancement despite the fact that the jury found that he committed Counts 1, 2, and 3 while on bond, under Title 18 U.S.C. 3147.

Under 18 U.S.C. § 3147, a person convicted of an offense committed while on release "shall be sentenced, in addition to the sentence prescribed for the offense to ... a term of imprisonment of not more than ten years if the offense is a felony." 18 U.S.C. § 3147(1). In our case, Pennick was convicted of 3 separate felonies in Counts 1, 2, and 3. Since, as found by the jury, these felonies were committed while on he was on release, the penalty provision of 18 U.S.C. § 3147 is statutorily triggered, adding 3 levels to the offense level for the offense

committed while on release. Therefore, the defense Objection to paragraph 29 should be denied.

Objections to Criminal History Points in paragraphs 43, 44, 45, 50-52, 53

The defense Objects to USPD's determination of various criminal history points assigned to the defendant. In the PSR, the USPD specifically identifies these crimes, and the applicable guideline section relating to each offense. The defense has not set forth any valid argument supporting the objections to the applicable guidelines used by the USPD in determining the criminal history points. Instead, the government believes that the USPD correctly used U.S.S.G. §§ 4A1.2(e)(3), 4A1.1(a), and 4A1.2(c)(2) in their criminal history determination.

As for paragraphs 50-52, the government believes that such information should not be stricken, despite no criminal history points being assessed to those instances.

Objections to Paragraph 53 consideration of Indictment 10-CR-191

The defense objects to the Court's consideration of the information, contained in paragraph 53 of the PSR, as it relates to Indictment 10-CR-191, claiming that it involves acquitted conduct, not relevant to the defendant's sentence determination. The government has continually maintained that such information is relevant to the defendant's sentence. At the sentencing hearing, the government presented evidence showing this Court how the

criminal conduct, under 10-CR-191, was relevant to the defendant's sentence regarding 17-CR-15.

At this hearing, Special Agent (SA) Marcello Falconetti, of the Federal Bureau of investigation (FBI) testified as to the investigation of the defendant, relevant to Indictment 10-CR-191-A. SA Falconetti testified how several different confidential informants (CI) advised the FBI that, between 2006 and 2008, the defendant and others were obtaining multiple kilograms of cocaine from Atlanta, Georgia, and Houston, Texas. (See Docket Entry 150, pp. 10-11, 33, Hearing Transcript of SA Falconetti). Eventually, in November of 2009, court authorized wire intercept orders were obtained for the telephones of David Manuel and Rodney Hill. (See Docket Entry 150, p. 12, Hearing Transcript of SA Falconetti).

The information obtained from these wire intercepts confirmed that the defendant, Hill, Manual, and others were obtaining multiple kilograms of cocaine from other cities. (See Docket Entry 150, pp. 12-13, Hearing Transcript of SA Falconetti). According to the information provided by these co-conspirators, SA Falconetti learned that between 2006 and 2008, the defendant along with these other individuals, obtained between **160-170 kilograms of cocaine**. (See Docket Entry 150, p. 42, Hearing Transcript of SA Falconetti).

This Court also heard testimony from Rodney Hill. Mr. Hill was a co-defendant under Indictment 10-191-A, and one of the defendant's major contributing partner in obtaining cocaine. Mr. Hill testified how in 2006, a little after the defendant got out of jail, he started dealing cocaine with the defendant. (See Docket Entry 151, pp. 116-117, Hearing Transcript

of Rodney Hill).  At the time, the defendant was on parole. (See Docket Entry 151, pp. 117, Hearing Transcript of Rodney Hill).  At the time, Hill and the defendant became partners in obtaining multi-kilogram amounts of cocaine from Atlanta, Georgia. (See Docket Entry 151, pp. 117-118, Hearing Transcript of Rodney Hill).  At first, Hill and the defendant obtained **6 kilograms of cocaine** in Atlanta, Georgia. (See Docket Entry 151, p. 118, Hearing Transcript of Rodney Hill).[11]  Eventually, that amount increased as the trips to Atlanta increased. According to Hill, between 2006 and 2007, Hill and the defendant were together involved in approximately **10** trips to Atlanta, each time obtaining **25 kilograms of cocaine**, for a total of approximately **250 kilograms**. (See Docket Entry 151, pp. 125-126, 127, Hearing Transcript of Rodney Hill).

This information is relevant to the defendant's sentence. Title 18, United States Code, Section 3661 provides that "[N]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of establishing an appropriate sentence."  Accordingly, there is no restrictions on the evidence the Court may receive at the hearing, and the reliability or weight of the evidence is within the discretion of the Court.

Pursuant to Guidelines § 1B1.3, "relevant conduct" includes:

(1) (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

---

[11]  At this time, they paid approximately $25,000/kilogram, and made about $40,000/kilogram. (See Docket Entry 151, pp. 117-120, 125, Hearing Transcript of Rodney Hill).

(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense,

* * * *

(3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions[.]

Therefore, all the information relating to Indictment 10-CR-191, obtained at the sentencing hearing, and set forth in paragraph 53, is relevant to the Court's determination of the defendant's ultimate sentence. In this regard, the government proved, by a preponderance of the evidence, that the dismissed conduct, under 10-CR-191-A was "part of the same course of conduct or common scheme or plan as the offense of conviction" under 17-CR-15-A, in that the defendant continually obtained multi-kilogram amounts of cocaine, to distribute to others.

Objections to Paragraphs 97 and 99, factors warranting an upward departure

The defense Objects to paragraphs 97 and 99 of the PSR, claiming that the USPD is using the information from Indictment 10-CR-191 as a basis for a potential upward departure of the defendant's recommended guideline sentence. The government disagrees, and believes

that such information is relevant in determining what sentence should be imposed upon the defendant.

Once the proper guideline range is identified, Title 18, United States Code, Section 3553(a) requires that the Court impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)].  In determining the sentence, the Court must consider, among other things, the nature and circumstances of the offense and the history and characteristics of the defendant; and the need for the sentence imposed to reflect the seriousness of the offense, afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.  See generally 18 U.S.C. § 3553(a). In executing these statutory responsibilities, the Court is obligated to:  (1) identify the Guidelines range supported by the facts; (2) treat the Guidelines as advisory; and (3) consider the Guidelines together with the other factors outlined in 18 U.S.C. § 3553(a).  United States v. Ratoballi, 452 F.3d 127, 131-32 (2d Cir. 2006).

Therefore, even if the Court disagrees that the 10-CR-191-A criminal acts meet the definition of relevant conduct, and applicable to the guideline calculation for Indictment 17-CR-15-A, they should apply to its evaluation of the sentencing factors pursuant to 18 U.S.C. § 3553(a).  In our case, relevant factors including the historical, and continual dealing of multi-kilogram amounts of cocaine, and the defendant's solicitation to murder his co-defendant, an upward departure and variance of his sentencing guidelines.

Although the government intends to make a more specific upward departure motion, according to the Court's sentencing schedule, in the meantime, the information contained in paragraphs 97 and 99 of the PSR is relevant for the Court's independent determination of the defendant's sentence.

### Conclusion

For the reasons stated, the government respectfully requests that the defense Objections to the PSR e denied in their entirety.

DATED:    Buffalo, New York, February 21, 2024.

> TRINI E. ROSS
> United States Attorney

> BY:    s/JOEL L. VIOLANTI
> Assistant United States Attorney
> United States Attorney's Office
> Western District of New York
> 138 Delaware Avenue
> Buffalo, New York 14202
> (716) 843-5854
> Joel.L.Violanti@usdoj.gov